Willie N. **MAYFIELD**, et al., Plaintiffs,

v.

Richard **THORNBURGH**, Defendant.

Civ. A. No. 86–435.

United States District Court,
District of Columbia.

July 30, 1990.

---

Kerry Alan Scanlon, Langley R. Shook, Washington, D.C., for plaintiffs.

Anne M. Gulyassy, Anthony J. Coppolino, Andrea Newmark, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM ORDER

JOHN H. PRATT, District Judge.

### I. *Introduction*

The issues raised by this class action have been amply set out in our previous rulings,[1] and for the most part we do not repeat them here. Briefly, plaintiffs are black non-attorneys employed at the Department of Justice's Tax Division who never applied for competitive promotions. They allege that the Tax Division's competitive promotion system violates Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–16 (1982), under both disparate treatment and disparate impact theories of liability. Presently before the Court is defendant's renewed motion for summary judgment or, alternatively, for decertification of the class. For the reasons that follow, we deny defendant's motion in its entirety.

### II. *The Motion for Summary Judgment*

#### A. The Applicable Legal Standards

Under Rule 56(c), Fed.R.Civ.P., a court must enter summary judgment against a party who "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). At this stage in the proceedings, it is not our function "to weigh the evidence and determine the truth of the matter," but merely to decide whether there are any genuine issues that require a trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505,

---

**1.** *See Mayfield v. Meese,* 704 F.Supp. 254 (D.D.C. 1988) (Pratt, J.); Memorandum Order, Sept. 1, 1987 (Pratt, J.); *Mayfield v. Meese,* 669 F.Supp. 1123 (D.D.C.1987) (Pratt, J.).

2510, 91 L.Ed.2d 202 (1986). In other words, our inquiry is limited to whether there are any material "issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511.

Our November 1988 denial of defendant's motion for summary judgment was based on two grounds. First, we found that genuine issues of fact existed as to whether plaintiffs would have applied for competitive promotions but for their belief that defendant's discriminatory practices rendered it futile to do so. *See Mayfield v. Meese*, 704 F.Supp. 254, 257 (D.D.C.1988).[2] Second, we recognized that plaintiffs might have had an insufficient opportunity to analyze data concerning defendant's promotion practices that was essential to their opposition. *See id.* at 256–57 & nn. 7–8; *see also Liberty Lobby*, 477 U.S. at 250 n. 5, 106 S.Ct. at 2511 n. 5; Fed.R.Civ.P. 56(f). Since that time, plaintiffs have analyzed this data and submitted a comparison of the promotion rates of black and white non-attorneys at the Tax Division. Resolution of the renewed motion for summary judgment turns largely on the sufficiency of these statistics.

■ Plaintiffs must show that a genuine issue of fact exists as to each element of a *prima facie* case of disparate treatment and disparate impact discrimination. *See Catrett*, 477 U.S. at 322, 106 S.Ct. at 2552. To make out a *prima facie* case of disparate treatment, plaintiffs must offer "evidence adequate to create an inference that" defendant's promotion decisions were racially motivated. *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52

L.Ed.2d 396 (1977). This burden may be satisfied by showing "a disparity in the relative position" of blacks and eliminating "'the most common nondiscriminatory reasons' for" that disparity. *Segar v. Smith*, 738 F.2d 1249, 1273 (D.C.Cir.1984) (quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981)) (second citation omitted), *cert. denied*, 471 U.S. 1115, 105 S.Ct. 2357, 86 L.Ed.2d 258 (1985). To make out a *prima facie* case of disparate impact, plaintiffs must establish that specific employment practices have resulted in observed statistical disparities between the racial composition of the desired jobs and the racial composition of the pool of those qualified for the promotions. *See Wards Cove Packing Co. v. Atonio*, —— U.S. ——, 109 S.Ct. 2115, 2121–23, 104 L.Ed.2d 733 (1989).

B. Plaintiffs' Statistical Analysis

■ Plaintiffs have submitted a statistical analysis of all promotion activities that occurred through October 23, 1984, the date on which plaintiff Mayfield filed his EEOC complaint. *See* Ex. A to Pls. Opp. According to their analysis, which compares the average number of days spent within grades by whites and blacks, whites are promoted at a faster rate than blacks. The analysis also indicates that blacks are concentrated in the lower GS grades, with not a single black employed at a grade above GS–12. Whites, on the other hand, are distributed more evenly among the grades and are employed at all grades from GS–2 through GS–15. The analysis further indicates that significant disparities exist in the promotion rates of blacks and whites at almost all applicable grades.[3]

**2.** At trial, plaintiffs must prove that they refrained from applying for competitive promotions solely because they believed that defendant's discriminatory conduct would have rendered it futile to do so. *See International Bhd. Teamsters v. United States*, 431 U.S. 324, 367–68 & n. 52, 97 S.Ct. 1843, 1870–71 & n. 52, 52 L.Ed.2d 396 (1977). As we held in November 1988, plaintiffs have cleared this hurdle as far as summary judgment is concerned, and we see no reason to re-examine that holding now. Contrary to defendant's assertion, plaintiffs are not required at this stage to show that the pro-

motions actually would have been denied. *See id.* at 367–68, 97 S.Ct. at 1870–71 (Once the non-applicant has shown "that he would have applied for the job had it not been for" the alleged discriminatory practices, he "is in a position analogous to that of an applicant," who in turn must establish a *prima facie* case of discrimination to proceed.).

**3.** According to plaintiffs' analysis, for example, a black GS–2 level employee waits an average of 285 days longer than his white counterpart to be promoted to a GS–3 position (56.7% disparity).

Defendant argues that these statistics do not support a *prima facie* case of either disparate treatment or disparate impact discrimination because they fail to focus exclusively on competitive promotions.[4] This criticism is not insubstantial; indeed, it ultimately may defeat plaintiffs' case at trial.[5] In order to avoid summary judgment, however, plaintiffs simply must raise a genuine issue of fact as to the existence of a disparity in competitive promotion rates. *See Catrett,* 477 U.S. at 322, 106 S.Ct. at 2552; *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11. This they have done.

Without a doubt, plaintiffs have demonstrated a disparity between the promotion rates of blacks and whites. Although the disparity might conceivably relate solely to within grade "career ladder" promotions, we must afford plaintiffs the benefit of all favorable inferences. *See United States v. General Motors Corp.,* 518 F.2d 420, 441 (D.C.Cir.1975). Moreover, "the problem of comparability is much less acute here than in *Wards Cove." Allen v. Seidman,* 881 F.2d 375, 379 (7th Cir.1989); *see also Emanuel v. Marsh,* 897 F.2d 1435, 1440 (8th Cir.1990) ("Unlike the hiring practice in *Wards Cove,* promotions were, in practice, made from ... the pool of lower level employees...."). In contrast to the skilled and unskilled workers in *Wards Cove,* the black and white employees compared in plaintiffs' analysis are not "obviously and substantially different in some relevant respect." *Allen v. Seidman,* 881 F.2d at 379;

*see also Emanuel v. Marsh,* 897 F.2d at 1440 (nothing in the "record demonstrates that the qualifications for the various GS-levels" at issue "are vastly different or at all exclusive of each other"). To the contrary, the fact that they all eventually received promotions indicates that defendant ultimately found all of them "qualified."

For these reasons, we hold that plaintiffs' statistics sufficiently compare "apples to apples" to survive a motion for summary judgment. This is enough for plaintiffs' disparate treatment theory to survive. We turn now to the final element of plaintiffs' *prima facie* case of disparate impact.

## C. Specifically Identified Employment Practices

■ Defendant claims that there is no evidence indicating that the disparity in promotion rates "is the result of one or more" specifically identified employment practices. *Wards Cove,* 109 S.Ct. at 2125. We disagree. Plaintiffs' sworn affidavits identify at least five allegedly discriminatory practices: (1) deflated performance appraisals; (2) failure to post job vacancies; (3) manipulation of job titles and qualifications; (4) relegation of blacks to low level jobs with limited promotion opportunities; and (5) nepotism. Viewed in conjunction with their statistical analysis, plaintiffs' anecdotal descriptions of these practices certainly raise a genuine issue of fact as to whether a causal connection exists between

Similarly, a black GS–4 level employee is promoted to a GS–5 position an average of 126 days later than his white counterpart (18.5% disparity). The difference at the GS–7 level is 189 days (12.6% disparity).

4. Specifically, defendant challenges that the analysis does not "distinguish between student aides and employees ineligible for promotions versus eligible employees, between applicants for promotion and non-applicants, or, most importantly, between competitive and within grade 'career ladder' promotions." Df. Reply at 7.

5. As the Court of Appeals stated in *Segar v. Smith:*

The most common nondiscriminatory explanation for a systemic disparity in treatment is a lack of qualifications among the minority group members. A plaintiff's statistical evi-

dence must therefore focus on eliminating this nondiscriminatory explanation by showing disparities in treatment *between individuals with comparable qualifications for the positions at issue.*

738 F.2d at 1274 (citations omitted) (emphasis added). To make out a *prima facie* case of disparate treatment, plaintiffs must ultimately persuade this Court that a disparity exists between the competitive promotion rates of "comparabl[y] qualifi[ed]" black and white employees. *See id.* (citations omitted). A similar standard applies to a claim of disparate impact. Under *Wards Cove,* the relevant statistical comparison is between the racial composition of the recipients of competitive promotions and the racial composition of those eligible for those promotions. *See Wards Cove,* 109 S.Ct. at 2121.

the two. Accordingly, we hold that plaintiffs have introduced sufficient evidence in support of their disparate impact claim to survive defendant's motion for summary judgment.[6] We turn now to defendant's request for decertification.

### III. The Motion for Class Decertification: Numerosity

■ When all the other requirements of Rule 23(a), Fed.R.Civ.P., have been met, a class may be properly certified if the group of potential members "is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). We previously found, in September 1987, that defendant's figures indicated sufficient numerosity. *See* Memorandum Order, Sept. 1, 1987, at 12 & n. 10. At that time, there were approximately 112 members of the putative class. This total included seventy-nine individuals who did not apply for promotion, but who were not yet at the top of their career ladders, thirteen employees who had been at the top of their career ladders for less than one year, three handicapped appointments, and seventeen employees who had been at the top of their career ladders for more than one year. *Id.* n. 10.[7]

Despite this ruling, defendant now baldly asserts that the only appropriate members of the class are those employees who, on or after June 4, 1984, reached the top of their career ladders and remained there for at least one year. Defendant claims that these employees total no more than sixteen and that joinder of this many claims is not

impracticable. In light of our September 1987 Memorandum Order, we decline to adopt such a rigid classification, and adhere to the broader definition of the class announced therein. Under that definition, there presently are approximately 109 members of the putative class.[8] This figure plainly satisfies the numerosity requirement of Rule 23(a)(1).

### IV. Conclusion

For the reasons stated above, defendant's motion for summary judgment or, alternatively, for decertification of the class, is denied. An Order consistent with the foregoing has been entered this day.

---

6. We agree with plaintiffs that defendant's rebuttal evidence (i.e., that the disparity, if it exists, results from a lack of qualifications among blacks or the failure of blacks to apply for promotions) does not entitle defendant to summary judgment. Plaintiffs must have the opportunity to demonstrate that any proffered nondiscriminatory reason for the disparity either: (1) is a pretext, *see Wards Cove,* 109 S.Ct. at 2126–27 (disparate impact); *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095 (disparate treatment); or (2) is not justified by business necessity. *See Wards Cove,* 109 S.Ct. at 2125–26 (disparate impact). This demonstration does not necessarily require additional proof, but it often requires a court to weigh conflicting evidence. As we stated earlier, this is not our function at the summary judgment stage. *See Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. at 2510.

7. We included the three handicapped employees in the putative class, despite our uncertainty as to their actual membership, because the difference in numbers was immaterial. Memorandum Order, Sept. 1, 1987, at 13 n. 10.

8. This total includes 61 individuals who, as of August 1989, had not applied for promotion, but who were not yet at the top of their career ladders, 12 employees who had been at the top of their career ladders for less than one year, 20 new appointments (employed for less than one year), and 16 employees who had been at the top of their career ladders for more than one year. *See* Fourth McConn Dec. ¶ 4.